May it please the Court, my name is Wendell Byrd, representing the Association of Christian Schools International, which is one of the two largest school organizations in the country, including 4,000 schools, 800 of which are in California, and also representing Calvary Chapel Christian School and some of its students. This is a challenge to viewpoint discrimination, as shown in several examples. And I'll give the UC policy as it's stated, and then several examples to give a flavor of what's involved in this case. First, in religion and ethics courses, which are some of the categories of approved courses as electives. UC's policy is given in its policy statement on religion and ethics courses. That rejects courses, regardless of their standard content, if they add material, quote, limited to one denomination or viewpoint. That's on its face, viewpoint discriminatory. For example, UC rejected women's studies from St. Mary's Academy. The reviewer asked the other reviewers, quote, Does anyone think this is too narrow a viewpoint? I was going along and thinking that it was a pretty good course until the outline mentioned the Catholic point of view. All the reviewers then rejected it as, quote, too specific in viewpoint. That's viewpoint discrimination. Or UC rejected Jewish philosophy from New Community Jewish High School, which our expert witness, a UC philosophy professor, said covered some very sophisticated philosophy texts. He also said that he was amazed that such college material could be taught to high school students. UC's ground for rejection was, quote, One-sided perspective, if expanded, has potential. That's viewpoint discrimination. Yet at the same time, UC approves electives such as women's studies in feminism, diversity studies, postmodern questions in art, multicultural perspectives, even though those obviously add a secular viewpoint to standard course material. Moving from religion and ethics courses to history and social science courses, UC rejects history and social science courses for adding a religious viewpoint to standard content. Susan Wilbur is UC's vice president in charge of admissions and of course review. She states UC policy. UC's policy as she stated it occurred in the deposition with the following question and answer. And this is at Excerpts of Record 968. Question. If an American government course provides all standard material on the subject of American government accurately, and in addition, provides a Christian perspective on American government as the only perspective, do you believe that the course should be approved or disapproved? Answer. We would probably not accept a single perspective. For example, UC rejected History of Christianity from Cathedral Catholic High School, stating as the reason, quote, We would expect a course in the history of Christianity to include more than one Christian viewpoint. That's viewpoint discrimination. Or UC rejected the Plaintiff Calvary's course, Christianity's Influence on American History, stating as the reason, quote, Need more than a religious perspective too slanted toward Christianity. That's viewpoint discrimination. Yet UC approves courses with added secular viewpoints, such as its policy that says, quote, History courses may view historical events from a particular perspective, such as African American history, women's history, or the Latino American experience. UC similarly rejects History and Social Science courses for adding any providential explanations to standard course material. The policy was stated by Susan Wilbur, Vice President, who created and sent a form letter rejecting certain courses for, quote, attributing historical events to supernatural causes. For instance, under that, UC rejected American History from Armona Union Academy, though it used only a secular text that was widely used in approved courses. The reviewer said she was, quote, leery of how much religion we can allow in specific courses. The textbooks they are using are fine, but am concerned with the following statements. And the first one that she quoted from the school's course outline was, quote, The role of God in history and principles of Christianity form a backdrop for our analysis of historical events and trends, close quote. UC similarly rejects English courses to move to a different subject area and other courses for adding a religious perspective to standard course material. Its policy was stated by Wilbur. Question, if an English course provides all standard material on English or literature and in addition provides a Christian perspective on the subject matter, but not other perspectives, do you believe that it should be approved or disapproved for A to G credit as an English course? Answer, we would probably not accept the course. For example, UC rejected Grammar and Composition from Cornerstone Christian School, an ACSI school. It stated its reason for rejection as, quote, Concerns about the fourth quarter reading material. The curriculum in general looks fine, close quote. Now, after three quarters of standard works of literature, the course in the fourth quarter used the following books, Foundations of Christian Education, The Philosophy of the Christian Curriculum, and Nurturing Children in the Lord, adding a religious perspective to standard course material and was rejected. That's viewpoint discrimination. Yet UC regularly approves courses that add a secular viewpoint to standard course material, such as Feminine Perspectives in Literature, Gender Roles in Literature, Gender, Sexuality, and Identity in Literature, Literature of the Counterculture, Literature of Dissent. Those examples illustrate what this case is about, viewpoint discrimination. And if I may turn to the more general facts briefly, UC requires approved course descriptions in order for students to be eligible for regular admission to UC. UC is the only university, California is the only state, that reviews course descriptions in private and public high schools and asserts the right to approve or disapprove those courses, though it doesn't review or approve actual courses, teachers, or students. Regular admission to University of California's ten institutions, and effectively to California State University's two dozen institutions, requires 15 approved courses, which are year-long courses. That's how 98.8% of students are admitted. In contrast to regular admission, exceptional admission is much more rigorous, and that's why only 1.2% of students are admitted in that manner. UC in 2004 did a change in position. Let me say a fact following you here. You're saying that UC should not be able to rely upon the course descriptions, but should, what, have to audit the courses themselves? Our expert witnesses said that UC's review was essentially meaningless and unreasonable because it was judging a book by a two-page cover. But that's not our argument in this case. Our argument in this case is, as UC does its course review in the manner that it currently does course review, it may not viewpoint discriminate. We're not challenging in this case its right to review and approve courses in private or public schools. We are questioning its right to go beyond identifying whether standard content is taught for the subject matter into whether an added viewpoint is or is not present, and rejecting courses if they add a religious viewpoint, while approving them if they add no viewpoint or add a secular viewpoint. That's this case. It came forward with quite a bit of evidence that says they allow the addition of additional religious viewpoints as long as it comes in the form of a secondary text, something of that sort. Is that correct? It was not at the time of the case being filed. UC is backed off of rejecting all courses just because they use certain stated texts as either primary or secondary material. They rejected 37 biology courses, 25 physics courses, and some number of chemistry courses, without regard to whether the stated texts were primary or secondary. Suppose a school wants to teach that the sun revolves around the earth. Would you say they have the right to reject credit for that course? Obviously, ACSI schools don't teach that, nor does any. Yeah, but could they reject it? Do you call that viewpoint discrimination? Your Honor, I would say that UC has the right to require the school to teach the majority scientific viewpoint, and if it does not do so, to reject the course. But if it does teach the majority viewpoint and chooses to add an additional viewpoint, that's, of course, an extreme example. But if it chooses to add a second viewpoint, much like the examples that I've just given you, it would be viewpoint discrimination for UC to reject the course for the added viewpoint and not for the presence or absence of standard course material. This is basically a judgment call that they are required to make. I mean, you agree that they can look at the courses? I do agree. And that takes us to what the standard of review here is. Is it rational review or is it strict scrutiny? All the cases look as though this would be a rational review sort of case situation. Well, Your Honor, in terms of the standard of review, there is no U.S. Supreme Court decision or decision of this circuit involving viewpoint discrimination that used rational basis review or even strict scrutiny. Viewpoint discrimination is simply forbidden. The Supreme Court decisions involving viewpoint discrimination, like the forum decisions, Rosenberger, Widmar, Cornelius, or the non-forum decisions, Southworth, and so forth, as they address viewpoint discrimination, don't use either level of scrutiny. However, What about Forbes and Finley? Forbes and Finley are an exception for non-forum cases. The general rule is obviously strict scrutiny of any content discrimination or other First Amendment infringement. Forbes involved what, cable TV programming? That was educational TV programming by a state-owned station, yes, Your Honor. And rational review was used there? No, sir, it was not. I'm sorry. Yes, sir, it was. And Finley involved, was that the endowment? Finley was the NEA grants, and that one did not use rational basis review. It didn't state a standard of review at all, but it certainly didn't endorse rational basis review. But the general standard is strict scrutiny. There is a carve-out in the forum and a carve-out in the non-forum cases for a very limited exception. In the forum cases, for a limited public forum or a non-public forum, the government has the right to limit the forum to its stated purpose, and as a consequence, it is able to make content distinctions so long as they're viewpoint neutral. It cannot practice viewpoint discrimination. In the non-forum cases, the three that you mention are the three that state the exception. Those cases involve either government speech selection or government selection of private speech to make available to the public. And in those cases, again, the rule is that there cannot be viewpoint discrimination. Turning to the- They do have the right to make judgment calls. They do. Content-based distinctions in that narrow area that's an exception to the usual First Amendment rule that content discrimination is forbidden unless it meets strict scrutiny. But it's very important to stress that those decisions do not allow viewpoint discrimination. Going to the three decisions that you just cited, Finley prohibited, quote, suppression of dangerous ideas, close quote, and said the result would differ if the policy, quote, raised concern about the suppression of disfavored viewpoints. Finley also said, quote, if the NEA were to leverage its power to award subsidies into a penalty on disfavored viewpoints, then we would confront a different case. American Library, the same thing, quote, viewpoint-based restrictions are improper when the government does not itself speak or subsidize transmittal of a message it favors. Forbes. Forbes described the ability of the government-owned educational broadcast station to make editorial decisions. But then it went on to say, quote, yet the requirement of neutrality remains. Viewpoint discrimination in this context would skew the electoral dialogue. So even those three cases stating the exception permitting certain content-based distinctions without strict scrutiny expressly disallow viewpoint discrimination, just as the forum cases in the exception, the limited public forum, non-public forum, that allow the forum to be held to its purpose, still say there can't be viewpoint discrimination. Addressing viewpoint discrimination, the district court ruled that viewpoint discrimination is permissible. It held that UC could properly reject courses, quote, about the academic merit of those religious viewpoints. It said that UC, quote, necessarily facilitates some viewpoints over others in judging the excellence of those students applying to UC. UC's brief defiantly defends its right to practice viewpoint discrimination as quoted at page one of our reply brief. And yet Supreme Court decisions have long held that viewpoint discrimination is prohibited. And that's true of the three cases you mentioned. That's true of the exception category within the viewpoint discrimination cases, the forum cases, and it's true of the remaining forum cases. Whether forum cases Rosenberger-Widmar, non-forum cases Southworth, Healy, Hurley, Boy Scouts, City of Lakewood, viewpoint discrimination is forbidden. Private high school courses are not a forum. UC's assertion of power to review those courses is not a forum. That's one thing the parties agree on, as in UC's brief, page 39. The district court did not find a forum here. However, all of the forum cases are instructive, as Southworth found, and all three types of fora have one thing in common. Viewpoint discrimination is forbidden. As Rosenberger said, quote, viewpoint discrimination is an egregious form of content discrimination. Quote, the government must abstain from it. Similarly, this circuit has prohibited viewpoint discrimination in fora, such as public school student club activities in Prince V. Jacoby, or messages on clothing worn in courthouses in San Martino v. First Judicial District Court, or messages on license plates in Arizona Life Coalition v. Stanton. In all those cases, viewpoint discrimination is forbidden in all categories of fora. The university cases that address viewpoint discrimination are, we believe, the appropriate cases for this court to rely on, and not the three cases that UC has picked for only one reason, not because they're close in facts, but because they're the only cases involving non-fora that use rational basis review. Well, they're the cases that involve quasi-governmental entities making judgment calls. It seemed to me to be a pretty close fit. Your Honor, a large portion of cases involve judgment calls, qualification, or disqualification. Those three cases, however, are unique, starting with the point that they agree with the other cases in forbidding viewpoint discrimination. They still expressly deal with either government's own speech or government's selection among speech that it's going to make available to the public, whereas University of California regulating, reviewing the courses within private high schools as to whether they'll be approved or disapproved for eligibility for regular admission to UC is not conducting government speech. It's not conducting government speech selection or private speech to be made available to the public. It's instead regulating private speech within private institutions. Well, not really. I mean, anybody can teach whatever they want. It doesn't prohibit the schools from teaching the courses exactly as they see fit. The question is whether it's going to be acceptable to UC. And what that means then, in effect, is whether the students will be eligible for regular admission to UC like 98.8% of those admitted get in by, or whether students will be rendered ineligible for regular admission and deprived an important public benefit, something that UC touts as being excellent academic instruction at a very reasonable cost. I notice you have about two and a half minutes left. I would like to reserve this panel. Thank you, Your Honor. Thank you, sir. Good morning. May it please the Court, Your Honors, there is no evidence. Can we get your name for the record? I'm sorry, Brad Phillips. Thank you. I apologize. There's no evidence whatsoever, Your Honors, of any student at any of these schools being denied admission to the University of California because of the policies about which they complain. First, and perhaps most importantly, even if courses are not approved by the University for A to G credit, a student is free to take an SAT2 subject matter test in that subject score in the upper two-thirds of test takers and thereby satisfy that credit. And there is no evidence that taking such tests is a burden on the plaintiff's religion or any sort of burden other than as one of the principals at these schools testified that the student might rather watch the ball game on Saturday. If I could turn, Your Honors, to the standard of review, NEA versus Finley and the American Library Association and Forbes are the controlling cases here. They establish that the university need only show that its decisions are reasonably related to its academic mission. In both of those cases, the government made decisions based on both content and viewpoint. They based decisions on whether material would be, quote, respect for the diverse beliefs and values of the American public. But the court upheld those decisions as reasonably related to the particular government functions, funding the arts and operating public libraries. And, Your Honor, while Finley itself, the opinion, doesn't specifically use the words reasonable or rational, it rejects heightened scrutiny. Indeed, the Supreme Court in ALA, American Library Association, expressly said that it had rejected heightened scrutiny in Finley. Well, the only thing that's left, if you're not using heightened scrutiny, is rational basis scrutiny. And it makes sense to apply heightened scrutiny in those situations. In most other situations, there's no inherent reason for the government to make decisions based on content or viewpoint of speech. And it might, therefore, be presumed, absent compelling contrary proof, that the decision was intended to suppress a disfavored content or viewpoint. So you have application of strict scrutiny in the public forum cases and cases involving outright prohibitions on various sorts of speech and the like. And I would note, Your Honor, that Southworth is, in fact, effectively a public forum case. It involved the use of student fees to fund student activities and speech on campus, intended to promote a variety of viewpoints and so on on campus. It's really a public forum case. But where the circumstances of the government's particular function, in and of themselves, provide an inherent legitimate reason for distinguishing based on content and viewpoint, the rationale for strict scrutiny disappears. In that circumstance, strict scrutiny would result in continual interference by the courts with the legitimate functioning of the other branches of government and judicial micromanagement of those branches' decision-making. Your Honor, plaintiffs make an attempt to distinguish ALA and Finley as involving government speech, and that effort is meritless. In each of those cases, as here, the government went beyond communicating its viewpoint. The NEA did not merely say, Art should meet these standards. It made funding decisions about private speech based on those standards. And similarly, in Finley, I mean, sorry, in ALA, it made acquisition decisions  Here, if you see merely published the A to G guidelines, said this is the sort of courses we like, that might be government speech. But once it makes decisions based on that, it's not government speech anymore, just as it wasn't government speech in NEA. Mr. Phillips, I'm sorry to interrupt you, but maybe you could, at some point in your presentation, comment upon, Mr. Byrd said that when a course, which was otherwise perfectly acceptable to the university, included an additional segment or portion that dealt with religious viewpoint, then the course was rejected as one for Cal. And I seem to recall reading in the briefs that there were a number of courses that the university had accepted, in which there was indeed an additional religious or Christian viewpoint. Is that correct? Well, Your Honor, it is not correct that the university rejected credit for courses that were, quote, otherwise acceptable. I guess that was my real question. Because it added religious content.  courses that satisfy the university's expectations about content and critical thinking skills, but also add some religious material, such as courses that use the BJU and ABECA biology text as secondary text. It is not correct that those courses were only approved after this lawsuit was filed. Your Honors, they were also approved before, and the position statement allows for such secondary texts to be used. Well, now, if that is correct, then what is it that would be complained about by the Association of Christian Schools? Well, Your Honor, I don't think they have a legitimate complaint. They claim, over and over and over again, that courses were rejected because they added a religious viewpoint. Yes, we heard that over and over again. It's a standard content. Suppose that's not true. What's left of the case? Nothing, I would submit, Your Honor. And there is, in fact, no evidence, in fact, in the record, no admissible evidence in the record, that any of the courses rejected were, in fact, satisfactory under the UC's reasonable judgment with respect to the content of those courses and the critical thinking skills that would be taught in those courses. They asserted, over and over again, that there's no evidence that that's true, Your Honor. And if I can just mention the religion and ethics policy, which is a somewhat different approach, and the reason it's somewhat different, you will see courses, religion courses, that are rejected because they're taught from a single denominational perspective or because they have a principal thrust of promoting personal religious growth. That's different from the treatment of other courses. And the reason for that is, and this is uncontradicted in the record, that the academic study of religion requires that religion be studied, not be studied exclusively from a single denominational perspective or promote personal religious growth. And I'm quoting Professor Scharf, who's the director of the UC Berkeley Religious Studies Program. He said, Any course that restricts the presentation to a single point of view or that uses the course to propagate a particular vision of personal religious growth fails to instill a basic critical skill required in the academic study of religion. And that is corroborated by the American Academy of Religion. Quote, The academic study of religion aims to treat all religious traditions even-handedly. And indeed, the scholar presented to the court, Mr. Prothero, Professor Prothero is presented to the court by plaintiffs, says, quote, It is crucial that the distinction between religious studies and theology, between teaching and preaching, be maintained and require courses in higher and secondary education. How many courses does the university approve in a year's time? Do you know? Do we know? Are we talking about thousands? Don't know. I think we're talking about thousands, yes, Your Honor. So it would not be inconceivable, would it, that in reviewing thousands and thousands of courses, they may reject one that should be approved and approve one that should be rejected? That's absolutely possible, Your Honor. And there may be courses, in fact, that should have been approved. They make mistakes and they correct them when they're called to attention. Sometimes they're not called to their attention. In Bishop v. Wood, the U.S. Supreme Court indicated that the fact that a governmental agency may make some mistakes in the course of applying an otherwise constitutional policy does not make for a constitutional violation. So following up on Judge Thompson's question, even if they can isolate one or two examples of courses that should have been approved but weren't, your answer to that is? Our answer to that is, Your Honor, first, this is a facial challenge. Certainly those, what we would describe as if they occurred, mistakes, would not support a facial challenge to the university's policies. The only courses at issue on an as-applied basis are the Calvary Chapel courses. Those courses all fail either because of the use of a textbook as a principal text that was deemed unacceptable by the university, or in the case of the English course, the fact that the course used an anthology of excerpts when the policy requires that students read full works in order to get credit for an English course. Those are the only as-applied challenges at issue now in the case. The other courses, if there had been an as-applied challenge that was live, I would submit there would not be one because it would be probably found to be a mistake. But that's about all that amounts to, I would submit, Your Honor. I would emphasize that the religion policy, again, does not favor one viewpoint over another. It favors an academic approach to the study of religion over a non-academic approach to the study of religion. And what's important to recognize here is the university doesn't claim the right to discriminate invidiously. And that's the key word in Finley and ALA based on viewpoint. The university here has made educational judgment about what's needed to ensure that it admits academically qualified students. In Grutter v. Bollinger, Your Honor, in a case involving the use of race by the University of Michigan in admissions, Grutter, the court stated, quote, by claiming the right to select those students who will contribute most to the robust exchange of ideas, a university seeks to achieve a goal that is of paramount importance to the fulfillment of its mission. And importantly, Your Honors, in that case, the Supreme Court then proceeded, although it was applying a compelling interest test because of the use of race, deferred to the judgment of the University of Michigan that it had a compelling interest. They said that they deferred to the school's educational judgment that such diversity is essential to its educational mission to assemble a class that is both exceptionally academically qualified and broadly diverse. Here, Your Honors, we ask only that the court defer to the educational judgment of the university that reviewing courses and so on for appropriate content and critical thinking skills is reasonable. There's no evidence of invidious viewpoint discrimination here, which would be a situation where a course was rejected without regard to its academic quality because of the viewpoint involved. So if the university accepted a course on Christianity and then rejected an academically comparable course on Buddhism, I would submit that would be invidious viewpoint discrimination. There is no evidence of that here, Your Honors. If I could just turn to some of the factual points that were made, and in particular with respect to Ms. Wilbur's testimony, the director of admissions of the university's testimony with respect to rejecting courses with a single perspective. Your Honor, in the deposition taken by Mr. Bird, before those questions were asked, Mr. Bird defined what he meant by a Christian perspective as a, and I quote on page SER 3692, in other words, if the Christian perspective is a claim that this is the correct position, and then on page SER 3693, she says, if that was the only perspective that was offered, we would not approve the course. It is undisputed in this record, Your Honor, that teaching students that they must accept one particular explanation as the one and only true explanation in science, history, government, English, is unacceptable from an educational perspective. Defendants' experts testified to that effect. Plaintiffs, he expert. Professor Bay testified to that effect, and it is corroborated by the various educational standards submitted by plaintiffs. Professor Bay testified, quote, in my opinion, it is personally abusive and pedagogically damaging to de facto require students to subscribe to an idea. Such a wrenching violation may well cause a student to develop a profound distaste for a subject area or to avoid it entirely, which would be a terrible educational outcome. And the California science framework says that nothing in science or any other field of knowledge shall be taught dogmatically. Compelling belief is inconsistent with the goal of education. Those academic principles by themselves support the university judgment that the textbooks at issue here, the history textbooks, the government textbooks, English textbooks, and biology textbooks, are not acceptable as principled texts. Because, for example, the BJU biology text says, and I quote, if the conclusions based on scientific methodology contradict the word of God, the conclusions are wrong. No matter how many scientific facts appear to back them, Christians must disregard those guesses and beliefs that contradict the Bible. Close quote. The university need not give science credit for a class that teaches students that because these students will not understand the critical thinking that's needed to approach science. And in the American government text, the textbook says, quote, for a government to be truly just is for it to define justice by the standard of God's character. So on that basis alone, these courses could and should have been rejected under the university's standards. The defendant's experts have gone into much greater detail for all of the reasons why these courses at issue and the policies, the textbooks at issue, would not teach students the content, the depth of content, not just checking off the boxes of a series of topics, but the depth of content and the critical thinking skills that a student who's going to attend the university, as opposed to all the... Many other students are not going to attend university and may not need the same preparation and critical thinking skills that these students do. But the university's judgment is that these do. I want to also... address, if I may, the use by Mr. Berg in oral argument comparable to the plaintiff's briefs, which is the reliance on course titles and snippets from course approval and disapproval forms. It is undisputed, and I would respectfully disagree with Mr. Berg with respect to his experts, because at S.E.R. 3610 and 3615, his education experts actually support the notion that reviewing course outlines is appropriate. Indeed, the American Association of Christian Schools International in deciding on accreditation uses course outlines and, quote, is being used in the school. But you can't tell just from a course title what's actually being taught in the course. And you can't tell from the fact that a form says that a course is too narrow or needs a different perspective what it is exactly that is going on there. And indeed, they go so far as to say that when we rejected... When the university rejected courses, they say we always were rejecting them because we were adding content, adding a viewpoint to standard content. Of course, they never defined standard content. But most of those cited course outlines in their brief, when they say that, are course outlines where the rejection says, quote, the content of the course outline submitted for approval is not consistent with the empirical knowledge generally accepted in the collegiate community. As such, students who take these courses may not be well prepared for success at the university. That's what those say. Plaintiffs say in their reply brief, well, what they mean by that, what they really mean by that, is that it added a religious viewpoint. And that when we say focus too narrow, what we really mean is that it's a shorthand for a single religious viewpoint. But there's no evidence that they cite that that's what the university meant and that's not consistent, in fact, with the content of those courses and the reasons actually articulated by the professors and by the reviewers. And I note that they make the argument that our rationales for course rejections are all, you know, post hoc. And they give us an example of that. The assertion on page 9 of their reply, they assert that our explanation for disapproval of history and government courses that they, quote, attribute historical events to divine providence is a post hoc rationalization. And the divine providence issue is one that counsel raised. But in fact, at SER 310 to 314, there is a document in which Professor Given, a UC history professor and on the Boers committee at the time, explained well before this lawsuit was filed. They quote, we simply do not accept supernatural causes. History is a human artifact caused by men and women. It does not privilege the Bible as an infallible text and historians do not accept any text as infallible. And the testimony is uncontradicted, again, that students need to learn history. The university doesn't have to give credit for a religion class for history. Again, these schools, and it is undisputed in the record, are free to teach whatever classes they choose and that students are free to take whatever classes they choose. Indeed, the only school that's a plaintiff, Calvary Chapel, has a full A to G course, at least in 2007 in the record, full A to G course curriculum approved by the university and Calvary Chapel testified that nothing in those courses was in any way offensive or contrary to their religious beliefs. And they satisfied the standards and their students could take those courses and be admitted to the university or not take the courses, take the SAT II and be admitted to the university. I would submit that this case is not in fact about religious or viewpoint discrimination. What this case is about is an effort by these schools effectively to get an exemption from the generally applicable and academically reasonable standards that the university applies for admission. Thank you very much. Thank you, Mr. Phillips. Mr. Byrd, I think you've got a couple of minutes left. Thank you, Your Honor. Mr. Phillips' last point, that the schools are free to teach what they choose, they are if they're willing to have the course rejected. And not eligible for UC credit. As, for instance, in the case of Calvary, one of the plaintiffs that he listed, saying that it has a full complement of approved courses. It's had a course in each subject area rejected because of adding a religious perspective to standard course material. Just before that, he referred to the rejection of courses because of explanation by divine providence as being something we claim to be post hoc. It's not. We didn't say that. That is viewpoint discriminatory. To say that if standard course material is taught and a religious viewpoint is added to say that, for instance, in a history course, after teaching all the facts of the Civil War, to add the statement that the Civil War was the judgment of God on America for permitting slavery is an added religious viewpoint. It is a providential explanation. But we don't at all allege that that is post hoc. Mr. Phillips started by saying that no course or student has been rejected, course rendered ineligible. And yet, at ER 2130, UC told North Hills Christian that it lacked UC and CSU eligibility for your students because of rejected courses. And several years later, in ER 1530, it said the same to them, that your courses are rejected and your students are still ineligible. Under UC's own supplemental excerpts at pages 3116 to 3279, at least seven ACSI schools lack an approved course in one or more of the subject areas that are required for their students to be eligible for UC. He then said, referred to the Finley American Library and Forbes decisions as involving both content discrimination and viewpoint discrimination. The cases do not say that. The cases do not involve viewpoint discrimination. They forbid viewpoint discrimination. He said that those cases do not involve government speech. However, American Library, in describing Finley and Forbes, said that they involve, quote, what private speech to make available to the public. In asking about the number of... I see you're out of time, so you want to wrap up and finish your sentence? Yes, Your Honor. The case does involve viewpoint discrimination where added religious viewpoints have been the basis for a lot of UC rejections and not standard course material until they developed post hoc justifications. Thank you very much. Thank you, Mr. Berg. Mr. Bradley, thank you. Thank you. The case is submitted.
judges: Hall, Thompson, Silverman